FILED

MAR 3 1 2011

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DIESEL MACHINERY, INC., | * | CIV 09-4087-RAL |
| A South Dakota Corporation, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | OPINION AND ORDER |
| vs. | * | GRANTING IN PART AND |
| | * | DENYING IN PART |
| THE MANITOWOC CRANE GROUP, | * | DEFENDANTS' MOTIONS FOR |
| a Wisconsin Corporation; | * | SUMMARY JUDGMENT |
| THE MANITOWOC GROUP, INC., | * | |
| a Wisconsin Corporation; | * | |
| MANITOWOC CRANES, INC., | * | |
| a Wisconsin Corporation; | * | |
| GROVE U.S., LLC, | * | |
| a Delaware Limited Liability Company; | * | |
| NATIONAL CRANE CORPORATION, | * | |
| a Delaware Corporation; | * | |
| DEUTSCHE GROVE GMBH, | * | |
| a German Limited Liability Company; | * | |
| POTAIN SAS, | * | |
| a French Limited Liability Company, | * | |
| | * | |
| Defendants. | * | |

## I. INTRODUCTION

In this action, Plaintiff Diesel Machinery, Inc. ("DMI") sued Defendants, collectively

referred to as "Manitowoc,"[1] for allegedly terminating the 2005 Distributor Sales and Service

Agreement ("the Agreement") between DMI and Manitowoc.  DMI alleged that the claimed

termination violated the South Dakota Dealer Protection Act ("SDDPA"), specifically SDCL

§ 37-5-3, and breached the Agreement.  DMI's Complaint prayed for recovery of lost future

---

[1]This Opinion and Order uses the term "Manitowoc" for stylistic ease when collectively
referring to all defendants and when distinction among defendants does not affect the Court's
analysis.  Various defendants are referred to individually where such distinctions are significant
to the discussion.

profits and punitive damages. Manitowoc filed a counterclaim seeking a declaratory judgment that DMI is obligated to perform its obligations under the Agreement and alleging that DMI breached the Agreement.

DMI filed a Motion for Partial Summary Judgment. (Doc. 61). Manitowoc filed a Cross-Motion for Summary Judgment (Doc. 84) on all claims, along with a Memorandum in Opposition to DMI's Motion for Partial Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment (Doc. 86). Subsequently, numerous discovery disputes arose and resulted in several extensions to the briefing schedule on the parties' dispositive motions. This Court granted DMI's request that its Motion for Partial Summary Judgment be denied without prejudice to refiling in accordance with the applicable scheduling order. (Doc. 197).

Manitowoc also filed a Motion to Dismiss Uninvolved Defendants (Doc. 121) and a brief in support thereof. (Doc. 122). DMI filed a Motion to Convert Defendants' Motion to Dismiss to One for Summary Judgment (Doc. 132), which this Court granted. (Doc. 148). After the parties completed briefing of these motions, this Court held a hearing addressing Manitowoc's two motions for summary judgment.

## II. FACTS NOT SUBJECT TO DISPUTE

Defendants Grove U.S., LLC ("Grove") and Deutsche Grove GmbH, now known as Manitowoc Crane Group, Germany, GmbH ("GMK") are engaged in the business of manufacturing various types of mobile hydraulic cranes. (Doc. 210, Plaintiff's Response,[2] at

---

[2]In order to view the facts in the light most favorable to DMI, this Opinion and Order takes facts from Document 210, which is DMI's Response to Defendants' Statement of Undisputed Material Facts. That document contains two sections - the Response to Defendants'

¶ 1). DMI is a construction and industrial equipment dealer located in South Dakota. Id. at ¶ 2.

In 1984, Grove entered into a dealership agreement with DMI designating DMI as a distributor of Grove hydraulic cranes for western South Dakota. Id. at ¶ 4. In 1997, DMI's territory was expanded to include the entire state of South Dakota. Id. at ¶ 5. In May of 2000, DMI also entered into an agreement with GMK to sell GMK products in South Dakota. Id. at ¶ 6. At the time, GMK was a subsidiary of Grove and also manufactured mobile hydraulic cranes. Id. at ¶ 7. In 2002, Grove and GMK were acquired by another defendant in this action and now are part of the group of defendants referred to as Manitowoc. Id. at ¶ 8.[3]

On November 15, 2005, DMI entered into the Agreement. Id. at ¶ 9. The Agreement gave DMI the right to sell and service Grove and GMK mobile hydraulic crane products in South Dakota. Id. at ¶ 10. The first paragraph of the Agreement stated:

> The Distributor Sales and Service Agreement ("Agreement") is made and entered into as of the 15[th] day of Nov[ember], 2005, by and between the Manitowoc Crane Group, including Manitowoc Cranes, Inc., a Wisconsin corporation, Grove U.S., LLC, a Delaware limited liability company, National Crane Corporation, a Delaware corporation, Deutsche Grove GmbH, a German limited company, and Potain SAS, a French limited company (collectively "Manitowoc") and Diesel Machinery, Inc. ("Distributor").

---

Statement of Undisputed Material Facts, numbered 1 through 46, and Plaintiff's Statement of Undisputed Material Facts, numbered 1 through 154. The Court will refer to the two parts of Document 210 as "Plaintiff's Statement" and "Plaintiff's Response," followed by the paragraph number.

[3]In its Statement of Undisputed Material Facts, Manitowoc asserted that defendant Manitowoc Cranes, Inc. acquired Grove and GMK. (Doc. 85, at ¶ 8). DMI disputes this and contends that defendant Manitowoc Company, Inc. made the acquisition.

(Doc. 87-6, the Agreement, at 2).  The Manitowoc Company, Inc. was not listed as a party to the Agreement or otherwise referenced in the Agreement.  See (Doc. 87-6).  DMI did not dispute that "Manitowoc Crane Group is a trade name used to refer to the crane companies related to the Manitowoc Company, Inc." (Doc. 123, Defs.' Statement of Undisputed Material Facts in Support of Motion to Dismiss Uninvolved Defs., at ¶ 1; Doc. 205, DMI's Response, at ¶ 1).

Section 1 of the Agreement stated that "Manitowoc hereby appoints Distributor on the terms contained herein to sell, rent and service the products listed in Exhibit A attached hereto ("the Products")." (Doc. 87-6, November 15, 2005 Distributor Sales and Service Agreement, at 2).  DMI admits that Exhibit A only listed Grove and GMK brand products and authorized DMI to sell Grove and GMK branded products but not other brands. (Plaintiff's Response, at ¶¶ 32-33).  Exhibit A to the Agreement provided:

The products referred to in Section 1 of the Agreement are as follows:

**Grove Hydraulic Cranes** consisting of the following:
-- Mobile Hydraulic Truck Mounted (TM) Models
-- Mobile Hydraulic Self-Propelled Rough Terrain (RT) Models
-- Mobile Hydraulic Self-Propelled All-Terrain (AT) Models
-- Hydraulic Crane Superstructures for special installations as offered

**Deutsche Grove Mobile Hydraulic Cranes (GMK) Models**

Parts, optional equipment and special additions for the above listed Products.

(Doc. 87-6, at 14).  The Agreement is the most recent contract between DMI and any defendant.  (Plaintiff's Response, at ¶ 12).

In 2008 and early 2009, Manitowoc evaluated its distributor situation in North Dakota and South Dakota for Grove/GMK mobile hydraulic cranes and Manitowoc lattice boom

-4-

cranes. Id. at ¶ 13. At the time, DMI was the distributor of Grove products in South Dakota, while Titan Machinery, Inc. ("Titan") was the distributor of Grove products in North Dakota. Id. Manitowoc had no distributor in either state. Id. Manitowoc's analysis included a memorandum evaluating numerous factors relating to its distributors in the Dakotas. Id. at ¶ 14. The internal documentation reflected a business decision for Grove to be represented in the Dakotas by the same dealer as Manitowoc. Id. at ¶¶ 14-15.

On June 17, 2009, during a meeting at DMI's office in Sioux Falls, DMI was provided with a letter providing 90 days' notice of termination of the Agreement. Id. at ¶¶ 21-24. The letter, written by Manitowoc Vice President David Hull and addressed to DMI President Dan Healy, provided:

> Pursuant to Section 13.A of the above-referenced Distributor Sales and Service Agreement, Manitowoc Crane Group hereby gives notice that said Agreement and all amendments thereto are terminated effective ninety (90) days from your receipt hereof. The rights and obligations of the parties surrounding this termination are set forth in Section 13 of the Distributor Sales and Service Agreement.

(Doc. 87-8). Notwithstanding the clarity of the letter, DMI disputes that Manitowoc officials said that the termination would be effective in 90 days, and understood, rather, that the termination was effective immediately and that the 90 day period was a waiting or grace period to allow DMI to tie up loose business. (Plaintiff's Response, at ¶ 22; Plaintiff's Statement, at ¶ 114).

Two days after the meeting and the date of the letter providing 90 days notice of termination, on June 19, 2009, DMI commenced this action against Manitowoc. Plaintiff's Response, at ¶ 26; (Doc. 1). On July 17, 2009, Manitowoc's counsel wrote to DMI's counsel that:

> "[I]t is Manitowoc's wish that DMI not advise customers that Titan will become a
> Grove dealer. <u>At this time DMI is still the Grove dealer.</u> Manitowoc will continue to
> support DMI as a Grove dealer until that relationship expires."

(Doc. 231-7) (emphasis added).

On July 24, 2009, Hull sent Healy a letter responding to DMI's request that Grove buy

back a Grove crane in DMI's inventory. Plaintiff's Response, at ¶ 34; (Doc. 87-9). In that

letter, Hull, on behalf of Manitowoc, wrote that DMI's "request seems premature for the

moment <u>since you are still our dealer until the</u> end of the 90 day contract period.

Nonetheless, we will agree to honor your request." Plaintiff's Response, at ¶ 34; (Doc. 87-9)

(emphasis added). As counsel acknowledged at the March 24, 2011 hearing, DMI had just

one Grove crane in inventory, and at DMI's request, Grove bought back that crane and DMI's

inventory of Grove parts at invoice cost - the actual amount that DMI had paid Grove.

On September 8, 2009, fewer than 90 days after providing the June 17, 2009 letter to

DMI, Hull transmitted another letter to DMI, stating:

> After further consideration and discussions with our South Dakota counsel, in
> connection with the November 15, 2005 Distributor Sales and Service Agreement
> ("Agreement"), please be advised that the Manitowoc Crane Group ("Manitowoc")
> hereby withdraws our June 17, 2009 letter in which Diesel Machinery Inc. ("DMI")
> received a 90-day advance notice attempting to terminate the Agreement. As such,
> the Agreement remains in full force and effect. DMI has been, is and now will
> continue to be the distributor as outlined in the existing Agreement. To be clear,
> Manitowoc will unconditionally honor and abide by the terms and conditions of the
> existing Agreement and South Dakota law. We would expect that DMI would do
> likewise.
>
> We look forward to working with DMI in the future as you distribute and service the
> products specified in the Agreement. We hope that we can grow that business to our
> mutual benefit.

(Doc. 87-10). On September 18, 2009, DMI's attorney sent a letter to Manitowoc's lawyers

requesting Manitowoc to explain the reason for withdrawal of the notice of termination.

(Doc. 214-3, Healy Affidavit, at ¶ 64). On October 7, 2009, DMI sent a letter responding to

Manitowoc, stating in pertinent part:

> A successful dealer franchise relationship requires trust that is earned through mutual
> respect and honesty. Manitowoc's willingness to knowingly break South Dakota law
> to get rid of DMI completely destroyed this trust. Manitowoc's failure to respond to
> DMI's request to explain itself only deepens DMI's belief that Manitowoc's recent
> letter is insincere. DMI further believes that Manitowoc's letter is merely a legal
> maneuver responding to DMI's lawsuit. Had DMI not sued Manitowoc we are certain
> that the notion of an "attempted termination withdrawal" would never have been
> proposed and that given a chance, Manitowoc would re-terminate DMI at its first
> opportunity.
>
> DMI's inventory of new cranes and new parts have been sold or returned. Advertising
> signs, placards and other items have been removed. I believe this concludes our
> termination and therefore unless I have overlooked something, please direct all further
> communications to our attorney.

(Doc. 87-11). DMI disputes that Grove remains ready, willing, and able to unconditionally

continue doing business with DMI under the Agreement, contending rather that "defendants

have invented a litigation strategy which states that[,] but in truth defendants would just

cancel DMI again." (Plaintiff's Response, at ¶ 43).

## III. DISCUSSION

### A. Jurisdiction and Choice of Law

Jurisdiction in this case is conferred by 28 U.S.C. § 1332 based on the parties'

diversity of citizenship and the amount in controversy exceeding $75,000. The Agreement

contained a choice of law provision designating that it "shall in all respects be interpreted,

construed and governed by and in accordance with the laws of the State of Wisconsin without

regard to principles of conflict of laws (except to the extent that the laws of another

jurisdiction mandatorily apply)." (Doc. 87-6, at 13). Under the SDDPA, "[a]ny provision in

any agreement evidenced by a franchise agreement, sales agreement, security agreement or

other form of agreement or arrangement of like effect between any wholesaler, manufacturer,

or distributor of farm machinery or implements and a retail dealer restricting jurisdiction or

venue to a forum outside this state or requiring the application of the laws of another state to

disputes arising under the agreement is void as a matter of public policy." SDCL § 37-5-11.

Because the SDDPA mandatorily applies, the Agreement and SDCL § 37-5-11 require that

South Dakota substantive law governs this dispute.

## B. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

proper when "the movant shows that there is no genuine dispute as to any material fact and

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut,

but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure

the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett,

477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). In a

determination of whether summary judgment is warranted, the evidence is "viewed in the

light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir.

2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir.

2006)). "If opposing parties tell two different stories, the court must review the record,

determine which facts are material and genuinely disputed, and then view those facts in a

light most favorable to the non-moving party, as long as those facts are not so blatantly

contradicted by the record that no reasonable jury could believe them." Id. (internal quotations omitted). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor." Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)).

## C. Count I

### 1. Whether a Cancellation of the Distributorship Occurred

The dispositive issue on Count I is whether a cancellation of DMI's distributorship occurred. Manitowoc argues that it never cancelled the Agreement and therefore Manitowoc could not have violated SDCL § 37-5-3.

The SDDPA declares that it is a Class 1 criminal misdemeanor for a manufacturer "to cancel" the franchise of a dealer "without due regard to the equities of the dealer and without just provocation." SDCL § 37-5-3; Groseth Int'l v. Tennenco, Inc., 410 N.W.2d 159, 168 (S.D. 1987). The SDDPA also provides civil remedies for violation of SDCL § 37-5-3. SDCL § 37-5-4 ("Each and every person and corporation who or which violates any provision of §§ 37-5-1 to 37-5-3, inclusive, shall be liable to any dealer damaged thereby for all damages caused to such dealer by such violation.").

For SDCL § 37-5-3 to apply, a manufacturer must cancel the distributorship. Here, Manitowoc delivered to DMI a letter on June 17, 2009, expressly providing 90 days notice of termination to DMI. Manitowoc's counsel in this case on July 17, 2009, sent a letter advising

-9-

that " [a]t this time DMI is still the Grove dealer." (Doc. 231-7). Manitowoc on July 24,

2009, sent yet another letter telling DMI that "you are still our dealer until the end of the 90

day contract period." (Doc. 87-9). On September 8, 2009, before the end of this 90-day

period, Manitowoc withdrew the notice of termination and advised DMI that Manitowoc no

longer intended to terminate the Agreement. (Doc. 87-10). DMI nevertheless argues that

Manitowoc's conduct meets the definition of "cancel" used in SDCL § 37-5-3 and that

Manitowoc is estopped to withdraw the termination.

"The construction of a statute is a question of law." State v. Harris, 494 N.W.2d 619,

622 (S.D. 1993) (quoting Vellinga v. Vellinga, 442 N.W.2d 472, 473 (S.D. 1989)). South

Dakota statutes "are to be liberally construed with a view to effect [their] objects and to

promote justice." SDCL § 2-14-12. The object of SDCL chapter 37-5 is protection of South

Dakota franchisees like DMI.

Words used in South Dakota statutes "are to be understood in their ordinary sense

except also that words defined or explained . . . are to be understood as thus defined or

explained." SDCL § 2-14-1. The statutes at issue do not define the word "cancel," so that

word is to be interpreted in its ordinary sense. Black's Law Dictionary defines "cancel" as:

> 1. To destroy a written instrument by defacing or obliterating it <she canceled her
> will by marking through it>.
> 2. To terminate a promise, obligation, or right <the parties canceled the contract.>

Black's Law Dictionary (9th ed. 2009). This represents the ordinary meaning of "cancel."

This ordinary meaning of the term makes no reference, implication, or suggestion to a

"notice" in any way satisfying the definition of or otherwise constituting a cancellation.

As acknowledged by DMI's counsel during the hearing, the words "cancel" and

-10-

"terminate" are synonyms. A "notice of termination" is not synonymous with a termination or cancellation of a dealership. Thrice in writing to DMI, Manitowoc made clear that the cancellation of DMI as a dealer was not immediate but was to occur at the end of the 90 day notice period. Manitowoc then rescinded the notice of termination 83 days into that period.

DMI urges the Court to consider the legislative history of the SDDPA. The legislative history, however, does not support interpreting the term "cancel" to include a notice of intent to terminate. DMI does not cite any hearings, committee reports, or floor debates concerning the South Dakota legislature's enactment of the SDDPA. Instead, DMI lists the dates on which the legislature enacted or amended various sections of the statute and argues that the South Dakota legislature consistently has expanded the protections of the SDDPA. To the extent that legislative history provides any insight into the issue before this Court, however, it suggests that a notice of termination does not constitute a termination or cancellation of a dealership agreement. During the 2011 session of the South Dakota Legislature, a bill was introduced in the South Dakota House of Representatives to amend the SDDPA. Among the proposed amendments, the bill would have created a new section defining the term "cancel" in the SDDPA expansively to include "the failure to renew a dealer contract, the substantial change of competitive circumstances of any dealership franchise, and *the notification of a dealer of a cancellation to be effective in the future*." H.B. 1108, 86th Legislative Assembly § 1 (2011) (emphasis added); (Doc. 231-2). DMI, through a registered lobbyist, requested that the legislature pass this expansion of the SDDPA. (Doc. 231-3). Healy and DMI's attorney in this case testified in favor of the amendment. The bill was tabled and did not become law. If DMI truly believed that the ordinary meaning of the

-11-

word "cancel" in the existing SDDPA already included a notice of termination, it is odd that DMI would urge the legislature to change the SDDPA to adopt a new and more expansive definition of "cancel" to include notice of cancellation.

No South Dakota court has considered the issue of whether a notice of termination constitutes a cancellation under the SDDPA. Courts in other jurisdictions have held that, in the context of franchise or distributorship relationships, a notice of termination of the franchise or dealership does not constitute a cancellation itself of the franchise or dealership when the notice of termination is withdrawn prior to the effective date. See Seckler v. Star Enter., 124 F.3d 1399, 1403-04 (11th Cir. 1997) (affirming decision that plaintiffs did not state a claim under Petroleum Marketing Practices Act ("PMPA") because the PMPA did not prevent a defendant franchisor from rescinding a notice of non-renewal); Akky v. BP Am., 73 F.3d 974, 974-75 (9th Cir. 1996) (affirming dismissal of claims of unlawful franchise termination under the PMPA because a series of notices of termination of plaintiffs' franchises that were later rescinded did not constitute termination and there was no evidence of coercive threats of termination or fraudulent behavior by defendant); see also Willys Motors, Inc. v. Nw. Kaiser-Willys, Inc., 142 F. Supp. 469, 470-71 (D. Minn. 1956) (distinguishing "cancellation without just cause" from "notice of cancellation").

For example, in Willys Motors, plaintiff automobile manufacturer provided defendant dealer 60 days written notice of cancellation of five dealership contracts. Willys Motors, 142 F. Supp. at 470-71. Each of the dealership contracts contained identical provisions requiring that either party provide 60 days notice prior to exercising their right to cancel and terminate. Id. at 470. Fewer than 60 days after plaintiff provided notice to the dealer, Minnesota enacted

-12-

a statute proscribing cancellation of the franchise of any retail dealer without just cause. Id. The 60-day period ran without any further action by the manufacturer. Id. When the manufacturer sued to recover on several promissory notes made by the dealer, the dealer brought a counterclaim based on the recently enacted statute. Plaintiff moved for summary judgment on the counterclaim on the theory that application of the statute to the cancellation would have an unconstitutional ex post facto effect because notice of cancellation occurred prior to enactment of the statute. Id. The court denied plaintiff's motion for summary judgment because cancellation was not effective until approximately 25 days after passage of the statute and "the statute is directed at cancellation without just cause, not notice of cancellation." Id. "Plaintiff had sufficient time after passage of the statute to comply with its terms by a show of just cause for cancellation, or, if that was impossible, to revoke the notice of cancellation." Id. at 471.

There is some authority that an action for injunctive relief is the proper way for a franchisee to contest notice of an intent to terminate. In Al's Serv. Ctr., Inc. v. BP Prods. N. Am., No. 03 C 4508, 2009 U.S. Dist. LEXIS 46112 (N.D. Ill. 2009), the district court noted:

> A franchisee can go to court when it receives a notice of termination; it need not wait until the termination is effective to seek injunctive relief. That does not mean, however, that the termination is effective when the notice is received.

Id. at *6; see also Seckler, 124 F.3d at 1403 (citing O'Shea v. Amoco Oil Co., 886 F.2d 584 (3d Cir. 1989); Beachler v. Amoco Oil Co., 112 F.3d 902, 909-10 (7th Cir. 1997)). The Seventh Circuit in Al's Serv. Ctr. affirmed the district court's ruling, finding that BP's letter stating that it would terminate plaintiff's franchise 10 days before condemnation did not constitute a termination of plaintiff's franchise under the PMPA. 599 F.3d 720 (7th Cir.

-13-

2010). At oral argument, DMI explained that it did not seek injunctive relief in its complaint filed two days after the 90-day notice of termination letter because DMI had lost all trust necessary to do business as a heavy equipment franchisee of Grove. Such a business decision by DMI, however, does not transform the 90-day notice of termination into immediate cancellation of the Agreement.

Franchise statutes in other states within this region confirm that a "notice of cancellation" does not constitute a "cancellation" and that a notice of cancellation may be voided prior to the effective date. Under the Wisconsin Fair Dealership Law ("WFDL"), a franchisor must provide a dealer with at least 90 days written notice of cancellation stating the reasons for cancellation. Wis. Stat. § 135.04. Such notice triggers a 60-day period in which the dealer may rectify the claimed deficiencies, thereby voiding the notice and avoiding cancellation. Id. Similarly, under the Minnesota Franchise Act, cancellation of a franchise may not occur until the franchisee: i) receives "written notice setting forth all the reasons for the termination or cancellation at least 90 days in advance of termination or cancellation, and ii) the recipient of the notice fails to correct the reasons stated for termination or cancellation in the notice within 60 days of receipt of the notice." Minn. Stat. § 80C.14. Iowa law expressly permits withdrawal of a notice of franchise termination for up to 90 days following the notice. The Iowa Franchise Act requires that:

> Prior to termination of a franchise for good cause, a franchisor shall provide a franchisee with written notice stating the basis for the proposed termination. After service of the written notice, the franchisee shall have a reasonable period of time to cure the default, which in no event shall be less than thirty days or more than ninety days.

Iowa Code § 523H.7. By requiring withdrawal of notices of cancellation in certain

-14-

circumstances prior to the effective date of cancellation, the above-referenced provisions of the Wisconsin, Minnesota, and Iowa franchise statutes provide more extensive protections to dealers than the SDDPA. The SDDPA neither *requires* voidance of a notice of cancellation under certain circumstance nor *prohibits* withdrawal of a notice of cancellation prior to the effective date. In short, dealer protection statutes from surrounding states recognize the distinction between a notice of cancellation and a cancellation itself.

Instead of citing a comparable franchise or dealership statute, DMI relies on cases involving interpretation of an employment agreement, an unemployment insurance statute, and a driver's license revocation statute, in support of its argument that the June 17, 2009 letter constituted a cancellation. See Portell v. AmeriCold Logistics, LLC, 571 F.3d 822 (8th Cir. 2009); Cohen v. City of Pierre, 2002 S.D. 110, 651 N.W.2d 265 (S.D. 2002); In re Petree, 520 N.W.2d 610 (S.D. 1994).

The facts and circumstances in the case at hand are more analogous to Seckler, Akky, Willys Motors, and Al's Serv. Ctr. than to Portell, Cohen, or Petree. Seckler, Akky, Willys Motors and Al's Serv. Ctr. each involved notices of termination to franchises or dealerships and squarely confronted the issue before this Court - whether a notice of franchise or dealer termination constitutes a cancellation. In each case, the court found that such notices did not constitute a termination until the effective date and that such notices could be withdrawn prior to the effective date. DMI attempts to distinguish the PMPA from the SDDPA by pointing out that, unlike the SDDPA, the PMPA requires that the franchisor provide the franchisee with a 90-day notice of intent to terminate and contains preliminary remedies that the franchisee may invoke during the notice period. Although the SDDPA does not include

-15-

these provisions, nothing in the SDDPA prohibits a manufacturer from providing a 90-day notice of intent to terminate or a dealer from seeking preliminary remedies such as injunctive relief during the 90-day period.

In contrast, in Portell "[t]he plain language of the employment agreement provide[d] for its automatic annual renewal unless, more than ninety days before the end of the then-current employment period, either party [gave] written notice of non-renewal to the other party," and "having bargained for ninety days of knowledge, the parties are entitled to rely on the statements (if any) made more than ninety days before the employment agreement's anniversary date." 571 F.3d at 824-25. Citing Seckler and Akky, the Eighth Circuit in Portell noted that interpretation of a dealer protection act is inapposite to "interpretation of an employment contract under Missouri law." Portell, 571 F.3d at 825 n.2. Similarly, interpretation of the SDDPA differs from the situation in Cohen in which the deferential standard of review for administrative decisions was applied in a case involving unemployment insurance law. 2002 S.D. 110, ¶ 10, 14, 651 N.W.2d at 267-68. Unlike the SDDPA, which expressly requires a manufacturer to "cancel" a franchise for a violation to occur, the law governing Cohen's benefits determination focused on whether or not her unemployment was "through no fault of [her] own." Id. at ¶ 13, 651 N.W.2d at 268. In addition, consistent with the import of the applicable statute in Petree providing that driver license revocation may be avoided by entering a plea before a revocation order issued, Manitowoc prevented cancellation of DMI by withdrawing the notice of termination before the effective date of termination. 520 N.W.2d at 613. The Portell, Cohen, and Petree cases do not support interpreting the word "cancel" in SDCL § 37-5-3 to include a "notice of

-16-

termination."

DMI's assertion that various verbal statements made by Manitowoc executives on June 17, 2009 cancelled DMI's dealership ignores the terms of the Agreement and does not create a genuine dispute of material fact on Count I of the Complaint. Under the Agreement, in order for a termination by Manitowoc to occur, "written notice" to DMI is required. (Doc. 87-6, at 9). The SDDPA does not prohibit parties from requiring written notice of termination. Viewing the evidence in the light most favorable to DMI, the written notice and correspondence between the parties make clear that Manitowoc was not causing an immediate termination of the Agreement. The notice of cancellation of June 17, 2009 and subsequent letters from Manitowoc on July 17, July 24, and September 8, 2009 leave no genuine dispute of material fact over the existence of a 90-day notice of termination that was later withdrawn, thus resulting in no cancellation of the Agreement occurring under SDCL § 37-5-3.

### 2. Whether Manitowoc is Estopped to Withdraw its Notice of Termination

DMI asserts that theories of equitable estoppel, promissory estoppel, and laches bar Manitowoc from using the September 8, 2009 letter in support of its motion for summary judgment.[4] As the basis for these theories, DMI notes that Manitowoc waited 83 days before

---

[4]DMI also contends that Manitowoc should be estopped because of the "legal principle[]" that "Manitowoc refuses to provide any discovery." (Doc. 216, at 36). This Court has ruled on the numerous discovery disputes and in a forthcoming opinion and order will deny DMI's motions to depose Manitowoc's in-house counsel and to compel discovery of dealer terminations outside of South Dakota. This Court already has ruled that DMI has not met the requirements for relief under Rule 56(d) (see Doc. 197, at 11-12), and no further submissions by DMI have prompted the Court to reconsider that ruling. DMI has deposed six Manitowoc employees and received an extensive document production. No additional discovery is needed to permit full consideration of the threshold issues presented by Manitowoc's motion for summary judgment.

withdrawing the 90-day notice of termination letter, deponents have invoked the attorney-

client privilege when asked about Manitowoc's decision to withdraw the notice of

termination, and DMI had wound up all the affairs of its Grove and GMK franchise by the

date of Manitowoc's withdrawal letter.

Under South Dakota law, the elements of equitable estoppel are:

1. False representations or concealment of material facts must exist;
2. The party to whom it was made must have been without knowledge of the real facts;
3. The representations or concealment must have been made with the intention that it should be acted upon; and
4. The party to whom it was made must have relied thereon to his prejudice or injury.

Hahne v. Burr, 2005 S.D. 108, ¶ 17, 705 N.W.2d 867, 873 (citing Cleveland v. Tinaglia,

1998 S.D. 91, ¶ 38, 582 N.W.2d 720, 727). Regarding the first element, DMI does not

identify any specific false representation of material fact. Manitowoc's invocation of the

attorney-client privilege in this litigation does not constitute a "concealment of material fact"

under the circumstances. Moreover, DMI had knowledge, through the notice of termination

and subsequent correspondence from Manitowoc, that the termination would not be effective

until 90 days after the June 17, 2009 notice.

Under South Dakota law, "promissory estoppel may be invoked where a promisee

alters his position to his detriment in the reasonable belief that a promise would be

performed." Wilcox v. Vermeulen, 2010 S.D. 29, ¶ 19 n.6, 781 N.W.2d 464, 471. The

elements of promissory estoppel under South Dakota law are as follows:

1. The detriment suffered in reliance must be substantial in an economic sense;
2. The loss to the promisee must have been foreseeable by the promisor; and
3. The promisee must have acted reasonably in justifiable reliance on the promise made.

Canyon Lake Park, L.L.C. v. Loftus Dental, P.C., 2005 S.D. 82, ¶ 38, 700 N.W.2d 729, 739 (citing Garrett v. Bankwest, Inc., 459 N.W.2d 833, 848 (S.D. 1990)). As with DMI's equitable estoppel theory, DMI does not specify which facts support each of the elements for its promissory estoppel theory. Presumably, DMI argues that the notice of termination constituted a promise to terminate that DMI justifiably relied on to its detriment and from which DMI suffered foreseeable losses. However, because the June 17, 2009 letter merely constituted a notice of intent to terminate rather than a termination under SDCL § 37-5-3, and Manitowoc repeatedly told DMI in writing that it remained a dealer during the notice period, any detrimental reliance by DMI could not have been reasonably justified or foreseeable. As became clear at oral argument, DMI had one crane and some Grove parts in inventory, which DMI requested Grove to take back at invoice cost. Grove accommodated DMI's request, while advising that DMI remained a Grove dealer. Thus, there does not appear to have been a detriment that was "substantial in an economic sense."

DMI's laches argument is untenable. The doctrine of laches is an equitable defense to lawsuits in South Dakota when a plaintiff engages in unreasonable delay before commencing suit despite having full knowledge of the facts upon which the action is based and such delay prejudices the defendant. See Bonde v. Boland, 2001 S.D. 98, ¶ 17, 631 N.W.2d 924, 927 (citing Conway v. Conway, 487 N.W.2d 21, 24 (S.D. 1992)). Here, litigation commenced two days after the notice of termination. Laches is not an appropriate defense to Manitowoc's motion for summary judgment on DMI's claims. Accordingly, summary judgment on Count I is merited.

**D. Count II**

-19-

In Count II of its Complaint, DMI alleges that "Manitowoc breached the Agreement by terminating DMI 'unfairly, without regard to the equities of the dealer and without just provocation.'" (Doc. 1, at ¶ 38). As discussed above, as a matter of law, the Agreement was never terminated. Therefore, DMI's breach of contract claim fails to the extent that it alleges a breach of an express contract.

However, under South Dakota law, "every contract contains an implied covenant of good faith and fair dealing that prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." Nygaard v. Sioux Valley Hosps. & Health Sys., 2007 S.D. 34, ¶ 20, 731 N.W.2d 184, 193-94. The covenant is "a method to fill gaps in a contract." Taylor Equip. v. John Deere Co., 98 F.3d 1028, 1032 (8th Cir. 1996). In discussing this implied covenant, the Supreme Court of South Dakota stated:

> This duty of good faith permits an aggrieved party to bring a breach of contract action when the other party: "by its lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." The meaning of the covenant varies with the context of the contract. Ultimately, the duty "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."

Nygaard, 2007 S.D. 34, ¶ 21, 731 N.W.2d at 194 (quoting Garrett, 459 N.W.2d at 841 (citing Restatement (Second) of Contracts, § 205, cmt. a (1981)). "South Dakota does not recognize an independent tort for breach of the implied covenant of good faith and fair dealing." Nygaard, 2007 S.D. 34, at ¶ 19, 731 N.W.2d at 193 (quoting Farm Credit Servs. of Am. v. Dougan, 2005 S.D. 94, ¶ 6, 704 N.W.2d 24, 27). "Punitive damages are recoverable

only when a 'party can prove an independent tort that is separate and distinct from the breach

of contract.'" <u>Schipporeit v. Khan</u>, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (quoting

<u>Grynberg v. Citation Oil & Gas Corp.</u>, 1997 S.D. 121, ¶ 18, 573 N.W.2d 493, 500). Thus, a

claim of breach of the implied covenant of good faith and fair dealing cannot support a

punitive damages claim.

Although DMI's complaint does not expressly claim a breach of the implied covenant

of good faith and fair dealing as a basis for the breach of contract claim, DMI's counsel

argued at the March 24, 2011 motions hearing that the Complaint did assert such a claim and,

alternatively, that DMI would request leave to amend its complaint to assert such a claim.

DMI's factual allegations can be understood as asserting that Manitowoc, as a result of bad

faith in deciding to issue a notice of termination, limited DMI from receiving the expected

benefits of the bargain.

Conceivably, providing notice of termination of a dealership agreement without just

cause and then revoking the notice with a week remaining in the notice period could

constitute conduct that "by its lack of good faith, limited or completely prevented the

aggrieved party from receiving the expected benefits of the bargain." This would be

particularly true when the franchisee liquidates inventory at a loss or takes other such actions

in reaction to the notice by the franchisor. Neither DMI nor Manitowoc briefed whether DMI

has a viable claim for breach of the implied duty of good faith and fair dealing or what

limitation there might be on DMI's damages claim if it indeed may maintain such a claim.

The parties have stipulated to an enlargement of the discovery deadline and anticipate further

depositions. Therefore, it is premature to rule on whether summary judgment should be

granted to Manitowoc on a claim of breach of the implied covenant of good faith and fair dealing.

DMI's counsel indicated a desire to amend the Complaint to allege a claim for breach of the implied covenant of good faith and fair dealing. Therefore, this Court will allow DMI 20 days to amend its complaint for that limited purpose. The motion for summary judgment on Count II, to the extent and only to the extent that it relates to an alleged breach of an express contract provision, is granted.

## E. Count III

DMI seeks punitive damages in Count III of the Complaint. DMI asserts that the wrongful conduct alleged in Counts I and II was "done maliciously, fraudulently, willfully and intentionally and/or with such reckless disregard and indifference for DMI that exemplary and punitive damages are recoverable herein to punish defendants for their misconduct and to deter others from like conduct." (Doc. 1, at ¶ 42). However, because this Court grants Manitowoc's motion for summary judgment on Count I and punitive damages are not recoverable under Count II, DMI's punitive damages claim fails as a matter of law. See Schipporeit v. Khan, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (quoting Grynberg v. Citation Oil & Gas Corp., 1997 S.D. 121, ¶ 18, 573 N.W.2d 493, 500).

## F. Manitowoc's Motion to Dismiss Uninvolved Defendants[5]

### 1. The Manitowoc Company, Inc.

The elements of a breach of contract under South Dakota law are "(1) an enforceable

---

[5]As discussed above, this Court treats Manitowoc's Motion to Dismiss Uninvolved Defendants as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

-22-

promise; (2) a breach of the promise; and (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 2010 S.D. 99, ¶ 21, 793 N.W.2d 36, 43 (citing Guthmiller v. Deloitte & Touche, LLP, 2005 S.D. ¶ 14, 699 N.W.2d 493, 498). It is axiomatic that an entity not a party to a contract may not be held liable for breach of contract. See, e.g. Pehle v. Farm Bureau Life Ins. Co., 397 F.3d 897, 901 (10th Cir. 2005); Henglein v. Informal Plan for Plant Shutdown for Salaried Employees, 974 F.2d 391, 397 (3d Cir. 1992); Gruender v. Rosell, No. CV-09-1347-PHX-DGC, 2010 U.S. Dist. LEXIS 50855, at *3-4 (D. Ariz. 2010); Kelly v. Tillotson-Pearson, Inc., 840 F. Supp. 935, 944 (D.R.I. 1994); Traffas v. Bridge Capital Investors II, No. 90-1304 MLB, 1993 U.S. Dist. LEXIS 12028 (D. Kan. 1993); Hotel Aquarius, B.V. v. PRT Corp., No. 92 Civ. 4498 (MBM), 1992 U.S. Dist. LEXIS 19603 (S.D.N.Y. 1992); Santella v. Grishaber, 672 F. Supp. 321, 328 (N.D. Ill. 1987). Because The Manitowoc Company, Inc. was not named as a party to the Agreement, Manitowoc's motion for summary judgment must be granted with respect to The Manitowoc Company, Inc.

### 2. Manitowoc Crane Group

Manitowoc argues that because Manitowoc Crane Group is merely a trade name and not a legal entity, it lacks the capacity to be sued and thus should be granted summary judgment on all claims. Under Rule 17(b) of the Federal Rules of Civil Procedure:

> Capacity to sue or be sued is determined as follows:
> (1) for an individual, who is not acting in a representative capacity, by the law of the individual's domicile;
> (2) for a corporation, by the law under which it was organized; and
> (3) for all other parties, by the law of the state where the court is located, except that: a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws . . .

-23-

Fed. R. Civ. P. 17(b). Manitowoc Crane Group is not an individual, corporation, partnership,

or unincorporated association.[6] Rather, it is undisputed that Manitowoc Crane Group is a

trade name. (Doc. 123, Defs.' Statement of Undisputed Material Facts in Support of Motion

to Dismiss Uninvolved Defs., at ¶ 1; Doc. 205, DMI's Response, at ¶ 1).

It is well-established that a trade name can neither sue nor be sued. See e.g., Pacheco

v. Joseph McMahon Corp., 698 F. Supp. 2d 291, 295 (D. Conn. 2010) (noting that "[i]t is

well settled that although a corporation is a legal entity with legal capacity to sue, a fictitious

or assumed business name, a trade name, is not a legal entity; rather, it is merely a description

of the person or corporation doing business under that name. Because the trade name of a

legal entity does not have a separate legal existence, a plaintiff bringing an action solely in a

trade name cannot confer jurisdiction on the court.") (internal citations omitted); Com-Pac

Intl', Inc. v. Packmate Co., No. 06-CV-467-DRH, 2007 U.S. Dist. LEXIS 62531 at *3-5

(S.D. Ill. 2007) (holding that "it would be imprudent to keep" defendant The Packmate

Company in case when plaintiff failed to proffer any facts supporting a finding that The

Packmate Company was more than a mere trade name) (citing Steel v. Hahn, 19 F.3d 22 (7th

Cir. 1993) (unpublished) [available in full text format at 1994 U.S. App. LEXIS 4369] ("you

can't sue a trade name")); Dillon v. Gottsch Emplrs. Group, LLC, No. 8:05CV467, 2006 U.S.

Dist. LEXIS 1935, at *6, 9 (D. Neb. 2006) (ruling that there was not "any indication that

Gottsch Enterprises is a legal entity with the capacity to be sued" when it merely was alleged

---

[6]DMI argues through conclusory allegations that Manitowoc Crane Group is a de facto partnership consisting of the other defendants as partners, a de facto association consisting of the other defendants as members, and a de facto joint venture consisting of the other defendants as parties, but DMI provides no facts in support. (Doc. 204, at 5-7). DMI, however, admits that Manitowoc Crane Group is a trade name.

-24-

by plaintiff to be "a trade name"); Commercial Union Ins. Co. v. SEPCO Corp., 300 F.

Supp. 2d 1198, 1202 n.7 (N.D. Ala. 2004) ("'CNA is not a legal entity capable of suing or

being sued. It is a trade name used by a related group of independent companies . . ."); 

Provosty v. Lydia E. Hall Hosp., 91 A.D.2d 658 (N.Y.A.D. 1982) (noting that "a trade name,

as such, has no separate jural existence" and "it can neither sue nor be sued independently of

its owner"). The Supreme Court of South Dakota has implied that a trade name cannot be

sued. See Hartley v. Jerry's Radio & Elec. Shop, 74 S.D. 87 (S.D. 1951). In Hartley, the

Supreme Court of South Dakota affirmed a trial court ruling that permitted plaintiff to amend

the record to change the name of defendant when plaintiff had erroneously sued a trade name

rather than the individual user of the trade name. Id.

      DMI does not dispute the legal principle that a trade name cannot be sued. Rather,

DMI argues that Defendants admitted that Manitowoc Crane Group can be sued and that

Defendants failed to assert an affirmative defense that Manitowoc Crane Group lacks the

capacity to be sued. To the contrary, Defendants' First Amended Answer and Counterclaim

stated that "[t]he Manitowoc Crane Group is misidentified [in the Complaint] as a

corporation. It is not a corporation." (Doc. 129, at 1). Defendants also stated the affirmative

defense that DMI has failed to state a claim upon which relief can be granted. (Id. at 10).

Because Manitowoc Crane Group is a trade name and a trade name cannot be sued,

Defendants' motion for summary judgment is granted with respect to Manitowoc Crane

Group.

### 3. Manitowoc Cranes, Inc., National Crane Corporation, and Potain SAS

      Manitowoc argues that no contract ever existed between DMI and Manitowoc Cranes,

Inc. ("Manitowoc Cranes"), National Crane Corporation ("National Crane"), or Potain SAS

("Potain") because the requisite purpose and consideration for formation of a contract are

lacking. In support, Manitowoc notes that the Agreement only authorized DMI as a dealer of

Grove and GMK products and not the products of any other defendants. Additionally,

Manitowoc contends that the Agreement does not require any defendant beside Grove or

GMK to perform any obligation.

DMI notes that Manitowoc Cranes, National Crane, and Potain are named parties to

the Agreement. The Agreement provides:

> The Distributor Sales and Service Agreement ("Agreement") is made and entered into
> as of the 1st day of November, 2005, by and between the Manitowoc Crane Group,
> including Manitowoc Cranes, Inc., a Wisconsin corporation, Grove U.S. LLC, a
> Delaware limited liability company, National Crane Corporation, a Delaware
> corporation, Deutsche Grove GmbH, a German limited liability company, and Potain
> SAS, a French limited liability company (collectively "Manitowoc") and Diesel
> Machinery, Inc. ("Distributor").

(Doc. 87-6, at 2). The Agreement proceeded to use the name "Manitowoc" throughout to

refer without distinction to the Defendants (except for The Manitowoc Co., Inc., which was

not named as a party to the Agreement).

Under South Dakota law, elements essential to existence of a contract are: (1) parties

capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause for

consideration. SDCL § 53-1-2. Manitowoc does not dispute that the Agreement satisfied

these four elements and constituted a valid contract. Rather, Manitowoc contends that the

Agreement applied only to Grove, GMK, and DMI.

According to Manitowoc, each of the entities were named in the Agreement because

Manitowoc used the same general template listing each Manitowoc-related entity whenever

-26-

entering into distributor agreements, and the parties to each specific distributor agreement were determined based on the product distribution rights listed in Exhibit A to each agreement. Neither the Agreement nor the record evidences this or contains any indication that Manitowoc informed DMI that the Agreement was only between Grove, GMK, and DMI; that Exhibit A defined the parties to the Agreement; or that obligations under the Agreement were somehow limited to Grove, GMK and DMI. To the contrary, the June 17, July 24, and September 8, 2009 letters discussed above each were signed by Hull - who was employed by Manitowoc Cranes - and were written on "Manitowoc Cranes" letterhead. (Doc. 87-8, 87-9, 87-10). The logo atop each letter simply said "Manitowoc," and the names of Grove, Manitowoc, National Crane, and Potain appeared at the bottom of each letter. (Doc. 87-8, 87-9, 87-10). Under the circumstances, a genuine dispute of material fact exists concerning whether a contractual relationship was formed between DMI and defendants Manitowoc Cranes, National Crane, and Potain. Therefore, summary judgment is denied to defendants Manitowoc Cranes, National Crane, and Potain as a genuine dispute of material fact exists on whether they are "uninvolved defendants."

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 84) is granted with respect to Count I and Count III of Plaintiff DMI's Complaint. It is further

ORDERED that Defendants' Motion for Summary Judgment (Doc. 84) is granted to the extent that Count II alleges breach of express contract and denied to the extent that Count II alleges breach of the implied covenant of good faith and fair dealing. DMI is granted leave

to amend its complaint within the next 20 days under Rule 15(a)(2) of the Federal Rules of Civil Procedure, if it wishes to proceed on the theory of breach of an implied covenant of good faith and fair dealing.  It is further

ORDERED that Defendants' Motion to Dismiss Uninvolved Defendants (Doc. 121), treated as a motion for summary judgment under Rule 56, is granted in part and denied in part.  The motion is granted with respect to defendants The Manitowoc Company, Inc. and Manitowoc Crane Group, and the motion is denied with respect to defendants Manitowoc Cranes, Inc., National Crane Corporation, and Potain SAS.

Dated March 31, 2010

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

-28-